THE STATE OF FLORIDA EX REL. RUSSELL H. HOADLEY
ET AL., RELATORS, vs. THE BOARD OF INSURANCE
COMMISSIONERS OF THE STATE OF FLORIDA, RE-
SPONDENT.—MANDAMUS.

1. Section 2, Article IV, of the Constitution of the United States
places citizens of each State upon the same footing with citi-
zens of other States so far as the advantages resulting from
citizenship in those States are concerned, and inhibits discrim-
inating legislation against them by other States. It insures to
citizens of one State the same freedom possessed by citizens in
other States in the acquisition and enjoyment of property and
pursuit of happiness, and guarantees to them in other States
the equal protection of their laws. The privileges and immu-
nities thus secured to citizens of each State in the several
States are those which are common to the citizens in other
States under their constitution and laws by virtue of their
status as citizens.

2. By the terms and policy of both the revenue act of 1895 and the
amendatory acts of that year in reference to insurance com-
panies, found in Chapter 4380, unincorporated associations, or
individuals, are authorized to obtain a certificate of author-
ity to engage in the business of insurance in this State upon a
compliance with the requirements of said acts.

3. Section 3 of Chapter 4380 requires that before any company, as-
sociation, firm or individual not of this State shall transact
any business of insurance in this State, it, or he, shall be pos-
sessed of at least $150,000 in value, invested in United States or
State bonds, or other bankable interest-bearing stock issued in
the United States at their market value, and such requirement
is not made as to unincorporated associations, firms or individ-
uals of this State, and to this extent the act is discriminative
as to citizens of other States, and of no effect.

This is a case of original jurisdiction.

The facts in the case are stated in the opinion of the
court.

*E. P. Axtell*, for Relators.

*The Attorney-General*, for the Respondent.

MABRY, C. J.:

This is an original proceeding by mandamus insti-tuted on the relation of Russell H. Hoadley and sev-eral other persons named, to compel the Board of In-surance Commissioners of this State to re-issue to re-lators, doing business under the associate name of the "South & North American Lloyds," of the city of New York, a certificate of authority to transact in-surance business in this State until the first day of October, 1896.

The alternative writ alleges that the relators are cit-izens and residents of the State of New York, and had associated themselves together under the name of the "South & North American Lloyds," of the city of New York; that said association was formed for the purpose of transacting a general business of fire and marine insurance in the said State of New York and elsewhere in the United States; and that the associa-tion was unincorporated, not having a charter under the laws of New York or any other State or foreign power, but was a voluntary association by agreement among relators, and known by the name stated. That relators, as such association, desiring to transact their business of insurance in the State of Florida, on a date in 1895, prior to the first of October, applied to the Treasurer, Comptroller and Attorney-General of the State, constituting the Board of Insurance Com-missioners, for a certificate of authority to carry on insurance business within the State, and after exam-ining into the affairs of said association and upon

complying with the laws of the State, the Board directed the Treasurer to issue to the association a certificate to do business within the State until October first, 1895, which was done. That on the first day of October, 1895, said association paid to the Treasurer of the State the sum of two hundred dollars, and furnished him with the name and address of each agent or solicitor of the association authorized to write insurance in the State, and also paid the sum of five dollars for each of said agents or solicitors as required by law, and thereupon the said board directed the Treasurer to issue to said association a certificate of authority to transact its business of insurance in the State until the first day of October, 1896. That in the month of January, 1896, said association furnished to the Treasurer a statement under oath showing certain facts stated, which are in compliance with the act of 1895, Chapter 4380, amending sections 2217, 2218, 2219, 2221, 2222, 2223 and 2224 of the Revised Statutes, except the requirement in section 3 of said act amending section 2219, in reference to the possession, on the part of the association, of at least one hundred and fifty thousand dollars in value invested in United States, or State bonds or other bankable interest-bearing stocks issued in the United States, at their market value. The alternative writ also states that the amount of gross receipts of the association in the State of Florida for the year ending December 31st, 1895, was $6,680.36, as shown by the statement, and that the association paid to the State Treasurer, on the 30th of January, 1896, one per cent. of said amount, together with five dollars for examining said statement. That the association had outstanding in the State of Florida on the 31st of December,

1895, four hundred and five policies of insurance, aggregating the amount of $361.385, as shown by the statement and during the month of January the association issued one hundred and sixteen policies of insurance in the State, aggregating the amount of $110,550. That said statement filed with the Treasurer did not show that the association had actually invested the amount of $150,000 in value in United States or State bonds, or other bankable or interest-bearing stocks issued in the United States at their market value, as required by section 2 (3), Chapter 4380 of the laws of Florida. It is further alleged that on the 4th of February, 1896, the said Board of Insurance Commissioners, after an examination of said statement filed with the Treasurer, revoked the certificate issued to the association, upon the ground that the association did not show an investment of $150,000 in value in the bonds and stock as required by the said act. The notification of the action of the board in revoking the certificate, addressed to the agent of the association, is made a part of the writ, and this notification states, that "section 3, Chapter 4380 laws of Florida, amending section 2219 Revised Statutes, requires all insurance companies, associations, firms or individuals doing an insurance business in this State to be possessed of an amount of bonds of the United States, or other bankable interest-bearing stocks issued in the United States. Your company or association not showing such bonds or stocks, does not comply with the law; and the Insurance Commissioners have this day revoked your certificate of authority, in accordance with the requirements of the statute." The date of this notification is February 4th, 1896. It is further stated that section 2 (3), Chapter 4380 laws of Florida, requiring

relators to have invested the amount of $150,000 in the bonds and stocks as stated is unconstitutional and invalid because it imposes upon them as citizens of another State restrictions and burdens that are not cast upon citizens of this State engaging in a like business, and that the reason assigned by the Board of Insurance Commissioners for revoking the certificate of authority to said association to do business in this State is insufficient to warrant such action; that said association is entitled to have said certificate re-issued, and also to continue to transact business of insurance in this State; and that relators have applied to said board to have said certificate of authority re-issued, but that it had declined to direct the Treasurer to issue the same.

The respondents move to quash the writ because it does not show that relators are entitled to the relief prayed; nor that the Board of Commissioners has unlawfully refused to issue a certificate of authority to said association to do business in this State.

The business of relators is that of fire and marine insurance, and the question presented is, whether the provision in section 3, Chapter 4380, acts of 1895, that "no insurance company, association, firm or individual, not of this State, nor agent, nor representatives thereof, shall transact any business of insurance in this State, unless such company, association, firm or individual is possessed of at least one hundred and fifty thousand dollars in value, invested in United States or State bonds, or other bankable, interest-bearing stock issued in the United States, at their market value," is, as applied to relators, in conflict with the provision of the Constitution of the United States, that "the citizens of each state shall be entitled to all privileges

and immunities of citizens in the several States." Under section 2217 Rev. Stat., the State Treasurer, Comptroller and Attorney-General were created a Board of Insurance Commissioners, and charged with the duty of examining into the affairs of any insurance company doing business, or applying to do business, in this State, and the provisions in the Revised Statutes relating to insurance companies designate the agencies by which such business was to be carried on as insurance companies, with some reference to whether they were incorporated under the laws of Florida, or any other State or country. Sections 2217, 2218, 2219, 2221, 2222, 2223 and 2224 of the Revised Statutes were amended in 1895 by the substitution of other sections in lieu of them, as shown by Chapter 4380, laws of that year. The same State officers are created a Board of Insurance Commissioners, with the duty to examine into the affairs of a company, association, firm or individual doing an insurance business, or applying to do such a business in this State. Section 1 of the act of 1895 provides for the creation of the board and its duties, and requires the officers, attorneys or agents of such companies, associations, firms or individuals proposing to do business in this State, to submit their books for the inspection of the board, and also undergo an examination relative to the business and securities of such companies, associations, firms or individuals, and which written examinations the Treasurer may publish, when he deems it to the interest of the public to do so. Section 2 of the act provides that no insurance company, association or individual, whether incorporated or not incorporated, and whether incorporated under the laws of this State or any other State or country, by agents, attorneys, subscribers or repre-

sentatives, directly or indirectly, shall take any risk or transact any business of insurance in this State, unless the company, association, firm or individual shall first obtain a certificate of authority from the State Treasurer under the directions of the Board of Insurance Commissioners to engage in such business, and before obtaining such certificate the company, association, firm or individual, shall furnish the Treasurer with a statement, under oath of the president, or vice-president of the company, or the attorneys, members, or subscribers severally of such association, firm or individual, showing certain facts which it is not necessary to state, as the alternative writ shows a compliance with the provisions of this section. There are other provisions in this section as to filing the statement and furnishing copies of the same, and also as to an agreement in reference to service of process in actions that may be instituted. The third section of the act, in addition to the provision already stated, provides that upon a compliance with the requirements of the second section, and furnishing satisfactory evidence to the board that such company, association, firm or individual has actually invested the amount of $150,000 in the securities mentioned, the Treasurer shall issue a certificate of authority to such company, association, firm or individual to transact the business of insurance in this State. This section also provides that insurance companies incorporated under the laws of this State shall be entitled to such certificate by furnishing satisfactory evidence to the board of the possession and actual investment of at least $25,000 in United States or State bonds or other bankable stocks or securities issued in the United States at their market value, and by otherwise complying with the

provisions of the act. Also that life insurance companies incorporated or organized under laws of any other State shall be entitled to such certificate by furnishing satisfactory evidence to the board that it is possessed of and has actually invested $100,000 in the bonds and securities mentioned, or in mortgages on unencumbered real estate worth double the amount loaned thereon, inclusive of buildings, and by otherwise complying with the provisions of the act. The fourth section provides that whenever any insurance company, association, firm or individual doing business in this State, upon a reasonable request from the State Treasurer, shall refuse to comply with any of the provisions of this sub-chapter, and whenever it shall appear to the board upon such examination that, in their opinion the assets of any such company, association, firm or individual, are insufficient under said provisions to justify the continuance in business of any such company, association, firm or individual, or that the condition of such company, association, firm or individual is unsound, the board shall forthwith revoke the certificate of authority granted, and shall cause a notification thereof to be published in some newspaper published at the capital, and such company, association, firm or individual, or agent, or representative, of the same, after such notice, is required to discontinue the issuing of any new policy, and the renewal of any previously issued. It also provides that it should be the duty of the Attorney-General to prosecute such company, association, firm or individual, or officers, agents or representatives, upon a report from the board that any of them had violated any of the provisions of the sub-chapter. There are other pro-

visions of this act, but they need not be specially mentioned.

The revenue act of 1891—appendix to Revised Statutes, page 929—prescribed a privilege license and tax for insurance companies doing business in this State and for agents of such companies. The revenue act of 1893, Chapter 4115, paragraph 5, section 9, prescribed a privilege license and tax for "each insurance company doing business in this State, including corporations of associations engaged in the business of insuring accidents to the person, acting as surety upon bonds, guaranteeing the fidelity of employees, and insuring employers against liability for accidents to employees, and including associations formed upon the plan known as 'Lloyds'." The language of the act of 1895, Chapter 4322, section 9, paragraph 5, is "each insurance company, association, firm or individual doing business in this State, including corporations or associations engaged in the business of insuring accidents to the person, acting as surety upon bonds, guaranteeing the fidelity of employees, and insuring employers against liability for accidents to employees, shall pay to the Treasurer," etc.

It is evident that there is nothing in the terms or policy of either the revenue act of 1895, or the amendatory act of that year, in reference to insurance companies, found in Chapter 4380, to prevent unincorporated associations or an individual, whether in this State or not, from obtaining a certificate of authority to engage in the business of insurance here upon a compliance with the requirements of said acts; but, on the contrary, they are expressly authorized by said acts to do such business. Section 3 of the act of 1895 clearly requires that before any company, association,

JANUARY TERM, 1896. 573

State ex rel. Hoadley et al. v. Bd. Insur. Comm'rs of Fla.—Opinion.

firm or individual not of this State shall transact any business of insurance in this State, it, or he, must be possessed of at least $150,000 in value, invested in United States or State bonds, or other bankable, interest-bearing stock issued in the United States, at their market value, and we do not see that any such requirement is made of companies, associations, firms or individuals in this State doing a little business here. Insurance companies incorporated under our laws are entitled to the certificate upon satisfactory showing of the possession and investment of at least $25,000 in United States or State bonds, or other bankable stocks or securities issued in the United States at their market value, upon a compliance with the other provisions of the act, and so far as individuals or unincorporated associations of individuals in this State are concerned, we do not see that they are required to show an investment of any amount in the securities in which companies, associations, firms or individuals not of this State, are required to invest to the extent of $150,000, except in case of life insurance business, when $100,000 must be invested. The language of the provision in section 3, is, that "insurance companies incorporated under the laws of this State, however, shall be entitled to such certificate of authority by furnishing evidence to the satisfaction of the said board that such company, association, firm or individual is possessed of, and has actually invested at least twenty-five thousand dollars" in the securities mentioned, and the use of the terms "association, firm or individual," might at first glance be thought to embrace individuals or unincorporated associations, as well as corporations under the laws of this State, but if this should be conceded to be so, it still results.

that such associations or individuals in this State can obtain the certificate to engage in the business of insurance here by showing an investment of only $25,-000 in the securities prescribed, while such associations or individuals, not of this State, and engaging in other than life insurance, will have to show an investment of $150,000.

The alternative writ alleges that relators were citizens and residents of the State of New York, and were unincorporated, and that their association existed by voluntary agreement among themselves, without a charter from any State or foreign power. The motion to quash, being in the nature of a demurrer, admits the statements of the writ to be true, and, this being so, we can not consider relators as existing in a corporate or *quasi* corporate capacity. The sole question presented, then, is whether the Legislature can prescribe discriminating conditions upon citizens of other States doing an insurance business in this State not imposed upon citizens here engaging in the same kind of business? In speaking of the clause in the Federal Constitution already quoted,—Article IV, section 2,—it is said in Paul vs. Virginia, 8 Wall. 168: "It was undoubtedly the object of the clause in question to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of

JANUARY TERM, 1896. 575

State ex rel. Hoadley et al. v. Bd. Insur. Comm'rs of Fla.—Opinion

happiness; and it secures to them in other States the equal protection of their laws." It is also stated in this opinion that privileges and immunities secured to citizens of each State in the several States by the Constitution of the United States are those privileges and immunities which are common to the citizens in the latter States under their Constitution and laws by virtue of their being citizens. The doctrine announced in this case as to the inhibition against discriminations by the several States against citizens of other States has been firmly settled by the Federal Supreme Court, and often repeated. Corfield vs. Coryell, 4 Wash. (C.,C.) 371; Ward vs. Maryland, 12 Wall. 418; Hooper vs. California, 155 U. S. 648, 15 Sup. Ct. Rep. 207; French vs. People, 6 Colo. App. ——, 40 Pac. Rep. 463; Cooley's Constitutional Limitations (6th ed.), p. 24, and authorities cited in note 4. As shown by the legislation of this State referred to, both resident and non-resident citizens are authorized to do insurance business in this State, and it is too clear to require any argument that a discrimination has been made as to the conditions upon which the business shall be conducted. The extent of the discrimination is not important, the only question is, does it exist?

It may be proper to state that we are not dealing, in this opinion, with the power of the Legislature to exclude entirely, or prescribe the conditions upon which foreign *corporations* may do business in this State (Paul vs. Virginia, Hooper vs. California, *supra*); nor do we consider the question of the right of the State to exclude entirely her own citizens, or those of other States, from the business of insurance here. Commonwealth vs. Vrooman, 164 Pa. St. 306, 30 Atl. Rep. 217, 25 L. R. A. 250. The State has expressly author-

ized both classes of citizens to engage in such business here, but has imposed conditions on the one, and none or if any clearly discriminative on the other. It is also apparent that Insurance Commissioners revoked the certificate of authority granted to relators solely upon the ground that they had not complied with the requirements of the statute imposing discriminations upon non-resident citizens, and, for the reasons given, we think there is no reasonable doubt about the invalidity of the questioned provision in the statute.

The motion to quash will be overruled. Ordered accordingly.